# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KIMBERLY DANNA-MULICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 19 C 8082 |
| v. | ) |
| | ) Judge Ronald A. Guzmán |
| MARCIA L. FUDGE, Secretary, | ) |
| United States Department of Housing and | ) |
| Urban Development,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff alleges that defendant failed to promote her to Director of the Chicago Field Office of the United States Department of Housing and Urban Development's ("HUD") Office of Community Planning and Development because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The case is before the Court on defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The Court grants the motion for the reasons explained below.

## FACTS

Plaintiff, Kimberly Danna-Mulick, is a woman who has worked for HUD since 1991. She joined the agency three months after graduating from Loyola University Chicago with a bachelor's degree in political science. Plaintiff began her career as a representative in HUD's Office of Community Planning and Development ("CPD") in Chicago. CPD is responsible for the "administration and management of [HUD] community development grant programs for the purpose of ensuring grantees develop viable communities by promoting integrated approaches that provide decent housing, a suitable living environment and expand economic opportunities for low[-] and moderate[-]income persons." (ECF No. 43-1, Pl.'s Ex. 10, Director Job Vacancy Announcement, at 2.) As a CPD representative, plaintiff processed grant agreements, reviewed reports for compliance, and organized conferences for grantees, among other things.

Plaintiff began her tenure with CPD as an employee at the GS-7 level on the federal government pay scale, but over the course of about nine years as a CPD representative, she progressed to a GS-12 pay level in that position. In March 2002, plaintiff was promoted to CPD program manager, a GS-13 position. As program manager, she was responsible for managing a

---

[1] Under Federal Rule of Civil Procedure 25(d), Secretary Marcia L. Fudge is substituted for her predecessor, Acting Secretary Matt Ammon, who was substituted for his predecessor, Benjamin S. Carson, the Secretary at the time this action was filed.

staff of eight CPD representatives, a financial analyst, and a program assistant. Plaintiff supervised her staff in processing grants, reviewing reports, conducting compliance monitoring, and delivering technical assistance and training, among other tasks. Plaintiff served as program manager from March 2002 to April 2004, when she voluntarily moved out of the supervisory role and into a "senior CPD representative" role due to family issues, including caring for elderly grandparents and a pregnancy with twins. As a senior representative, plaintiff managed nearly all of the primary grants administered by CPD, and she remained at the GS-13 pay grade.

Plaintiff worked as a senior representative until January 2011, when she applied for and received a promotion to serve as a program manager again, at the GS-14 pay grade. As with her first stint as a program manager, plaintiff was responsible for managing a staff of six or seven employees.[2] For some time prior to 2018, plaintiff worked with another program manager in managing several different kinds of grants and programs for CPD, including community development block grants ("CDBG"), disaster-recovery grants, and grants to create housing opportunities for persons with AIDS, among others. Plaintiff's grant portfolio totaled more than $770 million. In her employment with HUD, plaintiff had operational oversight over nearly every HUD program, including the grants mentioned above as well as various economic-recovery programs, emergency-shelter grants, empowerment zones, and rural-housing programs. Plaintiff supervised subordinate staff who implemented HUD's mission through its programs. She had extensive knowledge of the statutory and regulatory authority HUD is required to follow. In 2013, plaintiff "implemented collaborative problem-solving clinics for staff-driven resolution of common operational and supervisory issues." (ECF No. 47, Def.'s Resp. Pl.'s L.R. 56.1 Stmt. ¶ 3.) Her efforts resulted in the improvement of a regular annual report, the Program Year-End Review letter, and in improvement of management-employee relations. In 2018, plaintiff co-

---

[2] In response to defendant's Local Rule 56.1 statement of this fact, plaintiff states that it is "disputed, in part" and goes on to agree that she "was responsible for six or seven direct reports," but adds that she "also managed the major grant programs." (ECF No. 43, Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶ 9.) She subsequently states that this work entailed management, training, and oversight of the "entire office staff." (*Id.*) Plaintiff takes a similar approach in various other responses, disputing statements in whole or in part and adding argument or additional facts that are not directly responsive to a given statement. (*E.g., id.* ¶¶ 10, 28, 37, 39, 40, 41, 42, 43, 44, 45, 55.) This is an impermissible tactic that adds clutter to plaintiff's response. *See* L.R. 56.1(e)(2) ("A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made."). "Using such evidence to directly dispute the Defendant's facts is fine, but to be considered as facts affirmatively demonstrating why summary judgment should be denied, the Plaintiff's evidence must also appear in [her] statement of additional facts under the local rules. Putting this evidence in the statement of additional facts is necessary because the Defendant has no mechanism to 'reply' to the Plaintiff's responses to the Defendant's facts and thereby dispute the contentions raised in the Plaintiff's responses." *Anderson v. Iacullo*, 963 F. Supp. 2d 818, 822 (N.D. Ill. 2013) (some internal punctuation and citation omitted). Therefore, the Court has disregarded all additional assertions of fact contained in plaintiff's response to defendant's Local Rule 56.1 statement that do not directly dispute or are not directly responsive to defendant's properly supported statements of fact.

chaired a national accountability team, co-leading a working group to facilitate a HUD-wide Conflict Resolution Center for alternative dispute resolution. The group that she co-led also reviewed cultural diversity training for supervisors and bargaining-unit employees. Plaintiff also undertook a teambuilding in-service to improve employee relations during management team staff transitions and collaborated with Employee and Labor Relations to create new protocols for staff meetings to enhance respectful communications. While at HUD, plaintiff has received annual reviews. Other than her first evaluation, she has always received "outstanding" ratings, the highest possible rating. Plaintiff's 2017 evaluation was issued by Ray Willis, former Chicago CPD director, and his supervisor, Renee Ryles, the director of CPD's Office of Field Management. Plaintiff received an "outstanding" rating overall and for every Critical Element, including "Leading People." Plaintiff's 2018 evaluation was issued for the most part by Ryles, who again rated plaintiff as outstanding for every element.

From 2011 to 2017, plaintiff's first-line supervisor was Raymond Canchola, the Chicago CPD deputy director, and her second-line supervisor was Willis. When Canchola retired in 2017, the position of deputy director was not posted or filled, and Willis became plaintiff's first-line supervisor. Willis served as director and plaintiff's supervisor until he retired in March 2018. When Willis retired, Ryles contacted plaintiff and asked her to act as the "chief point of contact" for the Chicago CPD. Ryles met with the staff of the Chicago CPD and informed them that plaintiff was responsible for the office's operations and would be signing all the documents, including grant agreements. Plaintiff was not appointed as the "acting director" of the office; rather, Ryles served as acting director. It is disputed, however, whether plaintiff performed all or some of the duties of an acting director. According to plaintiff, it was plaintiff who performed the director's duties during the four-month vacancy. Defendant, however, says that while plaintiff was designated as the office's "point of contact," plaintiff's duties remained the same, except for the fact that she was authorized to sign certain documents on HUD's behalf. According to defendant, Ryles performed the functions that a CPD director would typically perform, including ensuring that grants are awarded, notifications are sent to grantees, contracts are executed, and reviews are performed within prescribed time frames. For that proposition, however, defendant relies on Ryles's deposition testimony of what *generally* happens when an individual is designated as a "point of contact," as opposed to being "detailed" as an acting director. Ryles's testimony was not specific to what occurred with plaintiff, and defendant does not properly dispute plaintiff's

fact statements in this regard.³ Thus, the Court deems admitted for purposes of the instant motion that plaintiff performed the CPD director's duties during the relevant time frame.

On April 10, 2018, an announcement was posted for the vacant position of Chicago CPD Director, a GS-15 position. Plaintiff applied. The vacancy announcement for the position stated that the director's duties would be to

- Oversee the effective management of a grant portfolio, CPD formula and competitive programs which includes large metropolitan areas and significant financial investments, ensuring the timely processing of grant applications, contract execution, and compliance with statutory and regulatory requirements, as well as HUD guidelines.

- Develop[], coordinate[] and formulate[] internal and external program policy issues that affect division operations; short- and long-term program missions, objectives, goals, schedules and functional or operational initiatives to meet new and technological developments or changes in program, legislation and or funding requirements; program initiations eliminations; organization structure changes; program cost reductions and improved operating efficiencies and effectiveness; budget resource allocations; and operating program planning, policies, procedures or regulations.

- Develop and execute multiyear and annual plans which are aligned with Departmental strategic goals and are responsive to specific needs of the community involving the Field Directors in the process.

- Leverage opportunities to work on an interagency basis with federal, state, national and local authorities to achieve community development goals and objectives.

---

³ In paragraph 8 of her Local Rule 56.1 statement of additional facts, plaintiff describes the meeting Ryles had with Chicago office staff and states that, as the "point of contact," plaintiff performed all the duties of a director and her own duties as program manager during the position vacancy; Ryles performed no functions of the Chicago CPD director after Willis's retirement; and Ryles rated plaintiff as outstanding in her 2018 evaluation. Defendant disputes these statements, but as support for the disputes cites only paragraphs 15 through 20 of defendant's own statement of material facts. (Def.'s Resp. Pl.'s L.R. 56.1 Stmt. ¶ 8.) Only one of those paragraphs, paragraph 19, is directly responsive to plaintiff's statements in paragraph 8 (paragraphs 16 and 18 are statements of general procedure that are not specific to what occurred in this case). Paragraph 19 states that the duties plaintiff carried out and the employees she supervised remained the same before and after she was designated the office's "point of contact." (ECF No. 37, Def.'s L.R. 56.1 Stmt. ¶ 19.) But the deposition testimony defendant cites in support of this statement (plaintiff's deposition testimony, no less) does not support it, and the evidence plaintiff submits contradicts it.

(Pl.'s Ex. 10, Director Job Vacancy Announcement, at 3.) To be minimally qualified for the position, applicants were required to have one year of "Specialized Experience," which included the following:

> Directing or providing management oversight of housing and community or economic development programs;
>
> Managing the development of administration of grant programs designed to improve the economic, physical, and social conditions of persons living in poverty;
>
> Managing collaborations with Federal, State, and local officials and organizations regarding housing, economic and community development issues and resolving controversial projects; and
>
> Directing and providing management oversight to a team that oversees disaster recovery efforts and/or ensures compliance over programmatic issues and financial resources.

(*Id.* at 4.)

To get the vacancy announcement posted on USA Jobs (the online portal to apply for federal jobs), Ryles worked with CPD administration to determine the "core competencies" required for the position, which resulted in a questionnaire for potential candidates to answer and submit with their applications. Ryles and HUD also prepared a Job Analysis for the position, which sets out "competencies" that are necessary for successful performance. The Job Analysis for CPD Director contains seven different required competencies, weighted by percentage of importance: (1) Organizational Awareness (20%); (2) Managing Human Resources (20%); (3) Information Management (10%); (4) Influencing/Negotiating (10%); (5) Oral Communication (15%); (6) Written Communication (15%); and (7) Team Building (10%). (ECF No. 37-1, Def.'s Ex. H, HUD Vacancy-Specific Job Analysis.)

Generally, when candidates apply for a job and complete a questionnaire, the Bureau of the Fiscal Service (an outside federal organization) "scores" the questionnaire responses to determine which candidates are "best qualified" for the position. The best-qualified candidates are then placed on a list, called a "certificate," which is submitted to the hiring official. It is possible for there to be multiple certificates for a given position because some positions have two separate postings on USA Jobs, one for internal candidates and one for external candidates. The Chicago CPD Director position was posted for both internal and external applicants. Ryles received two certificates of "best qualified" candidates—two internal candidates, including plaintiff, on one certificate and two external candidates on the other.

One of the external candidates was Donald Kathan, the area director of the Chicago regional office of the United States Department of Commerce's Economic Development Administration ("EDA"), a GS-15 position. At the time he applied for the director position, Kathan had served as the Chicago EDA area director for ten years, overseeing a six-state regional office and providing direct management oversight of economic development grant programs and disaster

5

recovery programs to assist economically distressed communities within the region.[4] At EDA, while Kathan never directly managed HUD grants, he managed seven major programs, some of which commingled in their funding streams HUD CDBG money and other HUD monies. Prior to his service as area director for EDA, Kathan was a program analyst with the United States Department of Veterans Affairs; an environmental engineer with the United States Environmental Protection Agency; and a flight commander with the United States Air Force.

After receiving the certificates listing the best-qualified candidates, Ryles assembled an interview panel consisting of herself; Lori Michalski, the deputy assistant secretary of CPD operations; and Joseph Galvan, the regional administrator of the Chicago HUD office. Ryles created a list of interview questions for the panel to ask the candidates. The questions were organized by topic and by interviewer. Plaintiff, Kathan, and a third candidate were interviewed by phone. The responses to the interview questions are not scored, and defendant does not provide model responses for the interviewers. Ryles and Michalski testified at their depositions that they took notes during the interviews (and Galvan testified that he did not), but Ryles could not find her notes, so the record contains only Michalski's notes. After the interviews were completed, the panelists conferred to discuss their impressions of the candidates. All three agreed that plaintiff and Kathan performed best at the interviews.[5] Prior to the panel's discussion, Galvan believed that the decision was a "toss-up" between plaintiff and Kathan, whereas Ryles and Michalski both ranked Kathan first and plaintiff second. Ultimately, after the interviewers' discussion, Galvan

---

[4] Plaintiff responds to defendant's statement of this fact as well as the statement regarding Kathan's prior experience, which are supported by citations to Kathan's résumé, as follows: "Undisputed that Kathan's resume so states." (Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶¶ 28-29.) Regarding Kathan's experience, plaintiff further states: "Disputed to the extent that Defendant is asserting that Kathan's resume is dispositive on the issue of his experience as no one involved in his hiring checked his references." (*Id.* ¶ 29.) These responses are improperly argumentative, and plaintiff offers no evidence to support her dispute as to Kathan's experience. The statements are therefore deemed admitted. *See Malas v. Hinsdale Twp. Dist. # 86*, No. 15 C 10490, 2019 WL 2743590, at *17 (N.D. Ill. July 1, 2019) (to the extent that a response to a statement of material fact provides extraneous or argumentative information, such a response constitutes an improper denial, and the fact may be considered admitted). Similarly, some of plaintiff's statements of additional facts contain improper argument and to that extent have been disregarded. (*E.g.*, Pl.'s L.R. 56.1 Stmt. ¶ 13 ("Kathan . . . was, at best, . . . minimally qualified for the Director job."); ¶ 17 ("Kathan's answers to questions were often either non-specific or not related to HUD's mission."); ¶ 31 ("[T]he entries in the margins of Michalski's interview notes must have been made sometime after Danna's interview, not during the interview.").)

[5] Plaintiff's response to defendant's relevant statement of fact is improperly argumentative: "Undisputed that the cited testimony so states. Disputed, that the panelists actually recall the interviewee responses. Ryles 'couldn't find' her notes and Galvan took none. Disputed that the record showed that Kathan interviewed well as he was not asked certain questions and often gave vague answers to questions he was asked." (Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶ 37.) The Court has disregarded all but the first sentence. *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (purely argumentative responses to the opposing party's statement of may be disregarded).

concurred with the others (but stated in an affidavit filed with the Equal Employment Opportunity Commission ("EEOC") that he did not make the final selection). Ryles, the final decision-maker, stated at her deposition that one of the reasons she preferred Kathan was her belief that, in light of "some tensions and disagreements" in the Chicago CPD office, the director "really needed to have very, very strong leadership skills and the ability to work with that office and bring them back together as a team," and Kathan had a "broad breadth of leadership skills." (ECF No. 37-1, Def.'s Ex. F, Dep. of Renee Ryles at 86, 97.) She also cited "what [Kathan had] done in the past to evolve team ownership and team cohesiveness." (*Id.* at 97.) In the affidavit Ryles provided to the EEOC, Ryles stated that the panel "felt [Kathan] provided a greater depth of experience in leadership, management oversight, directing staff and human relationship skills." (ECF No. 37-1, Def.'s Ex. E, EEOC Investigative Aff. (Witness) of Renee Ryles at 4.)[6] Michalski testified at her deposition that Kathan was selected because "he had broad leadership experience," "led a variety of staff, had been a manager and a leader for many years, and had some strong experience working with elected officials both at the local and federal level." (ECF No. 37-2, Def.'s Ex. O, Dep. of Lori Michalski at 110-11.) Galvan recalled that it was Kathan's relationships with outside agencies that made him the "stronger fit." (ECF No. 37-2, Def.'s Ex. R, Dep. of Joseph Galvan at 22, 24.)

Kathan was offered the director position and accepted. Plaintiff was informed of the decision on July 9, 2018. On August 14, 2018, plaintiff filed a complaint with the EEOC, alleging that HUD's failure to select her for the position was due to unlawful sex discrimination. This suit ensued.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Davis v. Kayira*, 938 F.3d 910, 914 (7th Cir. 2019). The Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmovant. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). Under Rule 56, the movant has the initial burden of informing the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmovant's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant need not produce evidence in a form that would be admissible at trial, but she must go beyond the pleadings to demonstrate that there is

---

[6] Plaintiff disputes defendant's fact statement that contains this information on the ground that "[n]o testimony supports the claim." (Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶ 40.) Nevertheless, defendant cites Ryles's *affidavit*, which supports the fact, and a district court may consider affidavits on summary judgment if, as is the case here, the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial. *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). Accordingly, the statement is deemed admitted.

7

evidence upon which a jury could reasonably find in her favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

The Court of Appeals recently described the framework for analyzing a Title VII claim as follows:

> Title VII prohibits an employer from discriminating against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . . In discrimination cases, when a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . or other proscribed factor caused the . . . adverse employment action. Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in *Ortiz v. Werner Enters., Inc.*, that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d 760, 766 (7th Cir. 2016).
>
> One way of proving employment discrimination under Title VII remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). The familiar *McDonnell Douglas* approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext. . . . But a plaintiff need not use the *McDonnell Douglas* framework after *Ortiz*. At summary judgment, what matters is whether a plaintiff presented enough evidence to allow the jury to find in [her] favor.

*Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957-58 (7th Cir. 2021) (some internal punctuation and citations omitted). For a failure-to-promote claim, the *McDonnell Douglas* approach requires a plaintiff to offer evidence that (1) she is a member of a protected class; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) defendant chose someone outside the protected group who was not better qualified than the

plaintiff.[7]  *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728-29 (7th Cir. 2013).

Defendant concedes that plaintiff satisfies the first three elements of a prima facie case of sex discrimination under the *McDonnell Douglas* framework, but contends that it is entitled to summary judgment because (1) plaintiff cannot demonstrate the fourth element—that Kathan was not better qualified than plaintiff—and (2) even if plaintiff could do so, defendant has offered a legitimate, nondiscriminatory reason why plaintiff was not selected, and plaintiff cannot show that this reason is pretextual. Plaintiff responds that under either the burden-shifting framework or *Ortiz*, there is evidence from which a jury could conclude that she was passed over for the director position because of her sex. Defendant's argument regarding plaintiff's and Kathan's qualifications merges the fourth element of a prima facie case with the pretext inquiry, and defendant has offered nondiscriminatory reasons for the selection of Kathan over plaintiff, so the Court will proceed directly to the issue of whether defendant's reasons were pretext for sex discrimination. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009)). Pretext is not just "faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Id.* at 389-90 (internal punctuation omitted). To show pretext, plaintiff must identify weaknesses, implausibilities, inconsistencies, or contradictions in defendant's explanation such that a reasonable person could conclude that it is unworthy of credence. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020).

Defendant offers legitimate, nondiscriminatory reasons for hiring Kathan as director instead of plaintiff. The primary reason, says defendant, was Kathan's leadership experience and skills. Ryles explained that she felt that the Chicago CPD director needed to be a strong leader to bring the office, which had had some personnel conflicts in the past, together as a team. She further stated that the interviewers believed that Kathan had greater "depth of experience" in management, staff direction, and human-relationship skills. Michalski cited Kathan's "broad leadership experience," which included managing a variety of staff and working with local and federal officials. Galvan also cited Kathan's relationships with outside agencies.

---

[7] The record contains passing references to possible comparators other than Kathan. In the EEOC proceedings and in plaintiff's deposition, plaintiff cited Rufus Washington, a man who applied and was chosen for the CPD director position in Los Angeles at the same time plaintiff applied for the Chicago position, as a comparator outside of plaintiff's protected class who she claims was treated more favorably. Defendant includes this fact in its Local Rule 56.1 statement, and plaintiff responds: "Disputed to the extent that Defendant is claiming this is Danna's only support for her discrimination claim. Kathan was also treated more favorably than Danna, as were the three male program managers that were [previously] promoted to Director of the Chicago CPD office." (Pl.'s Resp. Def.'s L.R. 56.1 Stmt. ¶ 51.) But plaintiff does not develop any argument about Washington or the others in her response brief, so to the extent plaintiff is attempting to raise or preserve an argument through this response about comparators other than Kathan, the argument is waived. *See United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) (perfunctory and undeveloped arguments are waived).

Plaintiff fails to offer evidence suggesting that defendant is lying about these reasons. Like the plaintiff in *Barnes*, plaintiff contends that there were problems with the interview process. She argues that while Ryles testified that the candidates were asked the same questions, Michalski's notes (some of which do not contain notes of responses for various questions) "show" that they were not. Plaintiff contends that Kathan was not questioned about his technology use or asked a particular question about leadership. And, as noted above, plaintiff criticizes the panelists' note-taking (or lack thereof, on Galvan's part), and Ryles's failure to retain her notes. These circumstances do not suggest pretext. As the Seventh Circuit has explained, just because interviews are not "cookie-cutter" or interviewing methods are unstructured, unwise, or ill-advised does not mean they are discriminatory. *Barnes*, 946 F.3d at 390; *see also Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005) ("There is no legal requirement that an interviewer ask all job applicants the exact same questions.").

Plaintiff asserts that her "objective qualifications" for the position "were so superior to Kathan's that they 'virtually jump off the page and slap you in the face.'" (ECF No. 42, Pl.'s Mem. Opp'n Def.'s Mot. at 10-11 (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1179 (7th Cir. 2002) (internal quotation marks omitted)). The Court disagrees. A plaintiff's qualifications do not establish evidence of pretext unless the competing qualifications are "so favorable" to the plaintiff that there can be "*no dispute* among reasonable persons of impartial judgment that the plaintiff was clearly better qualified." *Robertson*, 949 F.3d at 381. Notably, while plaintiff emphasizes her HUD- and CPD-specific experience, she fails to discuss the other aspects of the core competencies identified in the Job Analysis, other than to argue in conclusory fashion (and incorrectly) that Kathan met "almost none" of them. (Pl.'s Mem. Opp'n Def.'s Mot. at 9.) According to the Job Analysis, "organizational awareness," which could be demonstrated by "experience that reflect[s]" a long list of CPD program areas, constituted just 20 percent of the core competency for the job. While it is undisputed that Kathan had no experience overseeing HUD programs or grants, he had extensive experience overseeing economic-development programs and grants, some of which used HUD funding. Prior employment with HUD was not a requirement for the director position. The required "specialized experience" entailed "management oversight of housing and community or economic development programs"; it was not limited to management oversight of HUD-specific programs. Plaintiff maintains that she was "vastly more qualified" because she had twenty-seven years of experience at CPD and extensive knowledge of its programs, received "outstanding" ratings in her performance reviews, and "for all practical intents and purposes function[ed] as the acting Director" of the office at the time of the job vacancy. (*Id.* at 1, 3, 7.) She also contends that Kathan "had no experience in the most basic HUD/CPD tasks." (*Id.* at 1.) But the Job Analysis reveals that the director position involves high-level management and leadership work—overseeing the management of grant portfolios, developing annual performance plans, "leverag[ing] coalitions" with outside agencies, delivering oral presentations, addressing "highly controversial" or complex situations—not "basic" HUD tasks. Plaintiff fails to specifically discuss the six core competencies that were not HUD-specific and comprised the remaining 80 percent of the job: experience with human-resource and information management; influencing and negotiating; oral and written communication; and team building. Four of those core competencies, one of which pertains to "coalitions with internal and external partner[s]," refer to the director's role as the "CPD primary representative." (Job Analysis at 2, 3.) At the relevant time, Kathan had a decade of experience overseeing a six-state regional federal office, at the GS-15 level, a higher federal pay grade than plaintiff. He also had previous leadership experience in the military. As defendant points out, a higher pay grade is generally

10

associated with a higher level of leadership and job complexity. Plaintiff cannot write off Kathan's substantial leadership experience by simply declaring that he was "wholly unqualified." (Pl.'s Mem. Opp'n Def.'s Mot. at 11.)

Next, plaintiff attempts, unsuccessfully, to show that defendant's reasons are unworthy of credence by arguing that defendant has provided "conflicting explanations" for its decision. (*Id.* at 11-14.) Plaintiff points out that Ryles stated that Willis, the former Chicago CPD director, had told her at some time prior to his retirement that "[t]here were some conflicts with some staff members on the team as far as their interaction with [plaintiff] on supervisory content of work and discussions." (Ryles Dep. at 51-52.) Ryles could not recall any details about those conflicts. (*Id.* at 53.) Plaintiff claims that Ryles subsequently "denied that these conversations with Willis ever took place." (Pl.'s Mem. Opp'n Def.'s Mot. at 12.) Plaintiff, however, mischaracterizes Ryles's testimony. Shortly after mentioning the conversations about conflicts, Ryles was asked whether Willis had told her that plaintiff "had leadership issues." (Ryles Dep. at 59.) Ryles responded that she had not had "any conversations regarding leadership with Mr. Willis regarding [plaintiff]." (*Id.* at 59-60.) Ryles did not contradict herself because she did not refer to "leadership" when discussing Willis's mention of conflicts. Plaintiff also contends that defendant "is both lying about the reasons it did not select Danna (alleged office conflicts) and is also lying about these so-called office conflicts, at least insofar as they related to Danna's leadership." (Pl.'s Mem. Opp'n Def.'s Mot. at 13.) According to plaintiff, Ryles and Michalski "explicitly admitted in their depositions" that the "supposed conflicts in CPD involving Danna did in fact cause them *not* to select Danna" for the position. (*Id.* at 12.) Plaintiff again mischaracterizes the deposition testimony. Ryles testified that she had told the other interviewers that there were some "tensions and disagreements" in the Chicago CPD office and that some staff members were having problems working with plaintiff as the supervisor. (Ryles Dep. at 86.) Ryles could not, however, identify any specific deficit that plaintiff needed to "shore up," and she further stated that the conflicts in the office were not a reason why plaintiff did not get the job; rather, Ryles explained that she believed Kathan would be the "best fit" because of his breadth of leadership experience and his interview performance. (*Id.* at 53, 96-99, 106, 108.) Likewise, Michalski stated that the information Ryles relayed about conflicts in the Chicago office was not a reason for the selection of Kathan over plaintiff, but that the information did "support" the decision. (Michalski Dep. at 117-18.)[8] The testimony of Ryles and Michalski was internally consistent and consistent with each other's.

As defendant notes, plaintiff constructs a straw man in her attempt to cast doubt on defendant's veracity. Plaintiff argues that "Ryles, Michalski, and Galvan did not mention any leadership issues or office conflicts involving Danna in their EEO affidavits. They certainly raised no such issues within the EEO investigation in connection with their supposed reasoning in selecting Kathan over Danna." (Pl.'s Mem. Opp'n Def.'s Mot. at 14.) Plaintiff also cites Galvan's "no" response to the question, "Have you ever heard anything negative about Ms. Danna's leadership skills?" (Galvan Dep. at 12.) Defendant's rationale, however, is not that there had been

---

[8] Furthermore, plaintiff speculates that notations in the margins of Michalski's interview notes referring to plaintiff's "limited leadership" were not made contemporaneously or during the post-interview discussion, but "some time after Ryles decided to select Kathan" in an effort to "concoct" the leadership rationale. (Pl.'s Mem. Opp'n Def.'s Mot. at 13-14.) This inference is not supported by the evidence.

"issues" with plaintiff's leadership or that she had weak leadership skills; it is that Kathan had comparatively strong ones. Plaintiff's effort to poke holes in defendant's reasoning falls short.

Plaintiff's arguments that Kathan asked her questions about monitoring and other topics when he began his job at HUD, she had to "instruct" Kathan on "almost every practical aspect" of his position, and, in her view, he did not understand HUD's mission, (Pl.'s Mem. Opp'n Def.'s Mot. at 4, 10), also miss the mark. When analyzing pretext, the Court looks only to veracity, not whether defendant's assessment of the candidates was correct or whether its decision was wise. *See Barnes*, 946 F.3d at 390; *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered."); *Brill v. Lante Corp.*, 119 F.3d 1266, 1271 (7th Cir. 1997) (post-promotion performance of comparator was not relevant to plaintiff's claim of discrimination); *Thomas v. DeJoy*, No. 18 C 7856, 2021 WL 1088324, at *10 (N.D. Ill. Mar. 22, 2021) ("Subsequent events may suggest that the promotion decision was a mistake; they do not throw shade on the committee's stated belief that [the comparator] was the best choice[.]").

The Court rejects plaintiff's contentions that defendant's explanation is "amorphous" and "smacks of gender stereotyping" in that "[a] reasonable jury could conclude that HUD did not believe that a woman could be a 'strong leader' in this circumstance." (Pl.'s Mem. Opp'n Def.'s Mot. at 9, 12 n.3.) There is nothing amorphous or inherently gender-stereotypical about the desire for a strong leader to manage a field office. Perhaps the argument might have some force in an instance where leadership experience was the reason given for hiring a job candidate who in fact had no such experience or skills, but here that is not the case. HUD was looking for a strong leader, and it chose someone who had substantial leadership experience at a higher pay grade than plaintiff. That the experience was acquired at a different federal agency does not undermine it.

Viewing all the facts and reasonable inferences in plaintiff's favor,[9] her evidence falls far short of demonstrating that defendant's reasons for selecting Kathan were a guise for sex discrimination. There is nothing in the record that would allow a reasonable jury to conclude that plaintiff's sex motivated HUD not to promote her. Essentially, plaintiff's case is that plaintiff is a woman; a man was hired for the position; and plaintiff believes that the decision-makers should have placed greater weight on plaintiff's HUD-specific experience and her temporary performance of the director's duties. But as the Seventh Circuit has often observed, "federal courts are not a super-personnel department that second-guesses" facially legitimate business judgments of employers. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017). Because plaintiff fails to raise a genuine issue for trial, the Court will enter summary judgment in defendant's favor.

## CONCLUSION

Defendant's motion for summary judgment [35] is granted. Final judgment will be entered in favor of defendant and against plaintiff. The Clerk of Court is directed to substitute as defendant

---

[9] In so doing, the Court has disregarded defendant's argument that Ryles, the selecting official, is a woman and has promoted other women in the past.

in the case caption Marcia L. Fudge, Secretary, United States Department of Housing and Urban Development.  Civil case terminated.

**DATE:**  July 1, 2021

**Hon. Ronald A. Guzmán**
**United States District Judge**